IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

DANA HINZMAN; MICHELLE HINZMAN,

Plaintiffs,

v.

FOREMOST INSURANCE COMPANY OF GRAND RAPIDS, MICHIGAN,

Defendant.

Civ. No. 6:22-cv-01798-AA

**OPINION & ORDER**

---

AIKEN, District Judge.

This case comes before the Court on Defendant Foremost Insurance Company of Grand Rapids, Michigan's Motion for Summary Judgment, ECF No. 56. The Court granted Defendant leave to file supplemental briefing on the issue of the subsequent complete loss and replacement of the Property, with briefs "not to exceed five pages." ECF No. 79. Despite the clear terms of the Court's Order, Plaintiffs filed a seventeen-page Amended Response, ECF No. 85, to Defendant's Supplemental Memorandum, ECF No. 80. Plaintiffs did not seek leave to file an overlarge brief. The Court STRIKES pages six through seventeen of Plaintiffs' Response to the Supplemental Memorandum.

For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

### I. The Property

In 2019, Plaintiffs Dana Hinzman and Michelle Hinzman purchased a manufactured home for $80,000 and put it on real property in Detroit, Oregon (the "Property"). Maloney Decl. Ex. 1, at 2-3. ECF No. 57. Plaintiffs live in Lebanon, Oregon and the Property is a vacation home.

The Property has an enclosed attic with no access point. Maloney Decl. Ex. 4, at 3. The attic has ventilation under the eaves. Gower Decl. Ex. 1, at 10. ECF No. 60. There is insulation in the attic. The Property also has a crawlspace with insulation, but the crawlspace insulation is enclosed with plastic "belly paper." Kim Decl. ¶ 6, ECF No. 9-2; Maloney Decl. Ex. 1, at 92-93.

### II. The Policy

Plaintiffs insured the Property with Homeowners Insurance for Manufactured Home Policy No. 0921964374 (the "Policy") purchased from Defendant Foremost Insurance Company of Grand Rapids, Michigan. Maloney Decl. Ex. 7. The Policy was in effect at all material times. The Policy provides that Defendant will "insure risk of direct, sudden and accidental physical loss to the property[.]" *Id.* at 5.

### III. The 2020 Wildfires

In September 2020, the area around the Property was hit by severe wildfires and Plaintiffs evacuated from the area. Plaintiffs closed the windows and doors of the Property before leaving. Maloney Decl. Ex. 1, at 4. Plaintiffs notified Defendant of the loss on September 16, 2020.

When they returned in October 2020, Plaintiffs found that the Property had not burned or been directly damaged by the fires. Maloney Decl. Ex. 1, at 6. At their deposition, Mr. Hinzman estimated that the fires had burned within fifteen to twenty feet of the Property and testified that their neighbors had lost their homes in the fire. *Id.* at 7. None of the trees on Plaintiffs' land were destroyed in the fire. *Id.*

## IV. Adjustment of the Claim

A Foremost claims adjuster, Thomas Kim, came to assess the claim and took photos of the Property on October 8, 2020. Kim Decl. ¶ 3; Maloney Decl. Ex. 1, at 8. During the inspection, Mr. Kim found "minimal" visible ash and soot, which was "limited to the entry points of the house such as window sills and door jams." Kim Decl. ¶ 3. Defendant's practice in adjusting wildfire claims is to pay for soot, ash, and char ("SAC") that is visible to the naked eye. Maloney Decl. Ex. 12, at 2. Mr. Kim took photographs of the SAC in the Property. Kim Decl. Ex. 3.

During Mr. Kim's inspection, Mr. Hinzman told Mr. Kim that he thought the house needed to be taken down to the studs because Mr. Hinzman "wanted to know the extent of the damage" and to "make sure the insulation of the house was not damaged." Maloney Decl. Ex. 1, at 8-9. Mr. Hinzman wanted to have "all insulation completely replaced." Kim Decl. ¶ 3. Mr. Kim told Mr. Hinzman that the house would not be taken down to the studs. Maloney Decl. Ex. 2, at 15.

Mr. Hinzman showed Mr. Kim that there was ventilation from the exterior of the Property to the attic and the crawlspace. Maloney Decl. Ex. 1, at 22-23. Mr. Kim did not believe that the construction of the Property made it likely that SAC would

have contaminated the insulation in the attic or crawlspace. Kim Decl. ¶ 6. Mr. Kim denies that he told Plaintiffs that the attic was "sealed." *Id.* In his deposition, Mr. Hinzman admitted that the letter sent to him by Defendant also did not say that the attic was "sealed." Maloney Decl. Ex. 1, at 23.

During his deposition, Mr. Hinzman reviewed photographs taken during the inspection and was only sometimes able to point to soot or ash particles on the windowsills of the Property. Maloney Decl. Ex. 1, at 10-18. Mr. Hinzman testified that he did not have any photographs that showed more severe instances of SAC than what was revealed in the inspection photos. *Id.* at 18.

Following the inspection, Mr. Kim issued an initial cleaning estimate and payment for $7,378.97. Kim Decl. ¶ 4. Defendant did not pay to replace the insulation because Mr. Kim "saw no indication of damage to the insulation, or any supporting photographs of such damage." *Id.* ¶ 6. Mr. Kim affirms that "[b]ased upon my experience it would be very unusual or unlikely for there to have been damage to the insulation under these circumstances, particularly to a manufactured home which usually has enclosed attic and crawlspace insulation." *Id.* Mr. Kim "believed that the crawlspace insulation was enclosed by a plastic 'belly wrap' and the attic was an enclosed attic with no access." *Id.*; Maloney Decl. Ex. 1, at 92-93 ("As for the insulation of your home, as we have explained before, those items are enclosed either by belly paper or in the mobile home itself as your mobile home does not have an open attic which would expose the insulation to soot, char or ash."). Mr. Kim affirms that he told Plaintiffs on "multiple occasions" that "if there was later evidence or proof

that the insulation had been damaged, [he] would consider the submission as part of the adjustment of the claim and issue payment accordingly." Kim Decl. ¶ 7. Mr. Kim testified at his deposition that, during the claim, he never received "any indication showing there was soot, ash, or char on any of the insulation." Maloney Decl. Ex. 2, at 13.

Plaintiffs accepted payment from Defendant for the cleaning. On October 21, 2020, Servpro of Southeast Portland solicited Plaintiffs for a house cleaning estimate, which totaled $18,328.27. Maloney Decl. Ex. 1, at 19, 41. Plaintiffs sought a second estimate from Summit Cleaning and Restoration, which estimated a cost of $13,599 and sent this estimate to Mr. Kim. Kim Decl. ¶ 5. Because this amount was almost double the original estimate, Mr. Kim contacted ServiceMaster of Salem to obtain a comparison bid for cleaning the Property. *Id.*

On November 23, 2020, ServiceMaster provided a scope and estimate that did not include replacing the attic or crawlspace insulation, "but raised the possibility of doing so in a separate email." Kim. Decl. ¶ 5. On November 24, 2020, Defendant issued a payment to Plaintiffs in the amount of $12,213.89 based on the ServiceMaster estimate. *Id.* As noted, Mr. Kim informed Plaintiffs "[o]n multiple occasions" that "if there was later evidence or proof that the insulation had been damaged, [he] would consider the submission as part of the adjustment of the claim." *Id.* ¶ 7. No such proof was provided to Mr. Kim. *Id.* ¶ 10. Plaintiffs ultimately selected Summit Restoration for the remediation of the Property. *Id.* ¶ 8. After the

cleaning was complete, Summit reported that there was no smell of smoke in the Property. Maloney Decl. Ex. 2, at 13.

A separate issue arose about several bags of textiles. Kim Decl. ¶ 9. Jonathan Ehrenberg assisted Mr. Kim in getting photographs and inspecting bags of textiles in the Property as part of adjusting Plaintiffs' claim. Maloney Decl. Ex. 6, at 2. During that process Mr. Ehrenberg did not smell any smoke odor and did not see any SAC. *Id.* at 3. On March 9, 2021, Defendant sent a letter to Plaintiffs to inform them that the inspection of the bagged textiles revealed no smell of smoke or SAC and so there would be no adjustment for the cleaning or replacement of those items. Maloney Decl. Ex. 1, at 92. Plaintiffs paid a vendor to clean the bagged items, although Mrs. Hinzman testified that they did not attempt to wash the items first. Maloney Decl. Ex. 5, at 4.

With respect to the insulation, the March 9, 2021, letter stated:

> As for the insulation of your home, as we have explained before, those items are enclosed either by belly paper, or in the mobile home itself as your mobile home does not have an open attic which would expose the insulation to soot, char, or ash.

Maloney Decl. Ex. 1, at 92.

Paul Moreland, a private estimator/damage expert hired by Plaintiffs, performed an inspection of the Property. Maloney Decl. Ex. 11. Mr. Moreland estimated that the replacement cost for damage to the Property was $92,818,12. *Id.* at 11. Mr. Moreland testified at his deposition that he did not personally see any SAC in the crawlspace of the Property and that he was unaware of any reports of SAC on the interior of the Property after it was cleaned. Maloney Decl. Ex. 3, at 2-3, 6.

Mr. Moreland testified that he was unaware of any reports of the Property smelling of smoke after it was cleaned. *Id.* at 5, 12.

Philip Scott, an expert industrial hygienist hired by Plaintiffs, examined the attic by cutting a "very small hole" in the roof "just to access the outside of the insulation to see if there might be something there" and took a bulk sample of insulation in June 2022, accompanied by Mr. Moreland. Maloney Decl. Ex. 4, at 3. Mr. Scott performed a tape lift sample at the ridge cap. *Id.* at 19-20. The tape lift sample revealed that, of the particles collected from the ridge cap, 6% were char, 1% soot, and 2% ash. *Id.* at 11, 22. Mr. Scott testified that there was no way to determine if the SAC he found in the tape test was from the 2020 fires or migrating smoke from subsequent fires in 2021. *Id.* at 8-10.

Mr. Scott also collected and tested the attic insulation sample and found no detectable SAC. Maloney Decl. Ex. 4, at 4 (Mr. Scott testified that a "negative" result meant "less than the lower analytical detection," or "nondetectable."). Mr. Scott testified that none of the insulation tested in the Property yielded a positive result for SAC and that no SAC was visible when he opened the hole in the ridge line of the Property. *Id.* at 5. Mr. Scott testified that there was no odor of smoke in either the attic or the crawlspace. *Id.* at 6-7.

Mr. Scott also examined the crawlspace of the Property but was unable to recall if there was any insulation in the crawlspace. Maloney Decl. Ex. 4, at 13. Mr. Scott testified that the crawlspace was "a very narrow space and [he] chose not to crawl back there." *Id.* at 13-14. Mr. Scott did take a sample from an ABS pipe that was

close to the entrance of the crawlspace which revealed 3% SAC. *Id.* at 13, 22. Mr. Scott also testified that he observed staining on the pipe, but did not note it in his report, did not test it, and was unable to identify it in photographs. *Id.* at 17. Other than the presence of SAC, Mr. Scott did not observe any other distinct or demonstrable damage to the Property. *Id.* at 12.

Mr. Moreland testified that he saw soot on the top of the roof ridge beam when he participated in opening up the ridge cap with Mr. Scott but testified that he did not see any SAC on the attic insulation, nor had he seen any photographs, reports, or other evidence of SAC in the insulation of the attic or the crawlspace. Maloney Decl. Ex. 3, at 3-4. Mr. Moreland testified that he did not examine the crawlspace insulation because it would have required cutting through the belly paper and that he did not believe that Mr. Scott or anyone else had done so. *Id.* at 8-9.

Mrs. Hinzman testified that, beginning in 2022, Plaintiffs resumed using the Property on the weekends but have not undertaken any lengthy stays in the Property. Maloney Decl. Ex. 5, at 2-3. Mr. Hinzman testified that "it still smells like smoke." Gower Decl. Ex. 3, at 4. Mrs. Hinzman testified that she can smell smoke in two closets in the Property, but that she could not smell smoke elsewhere on the Property. Gower Decl. Ex. 4, at 2.

During the course of their dispute with Defendant, Plaintiffs did not replace the insulation in the Property themselves. Maloney Decl. Ex. 5, at 9. Mrs. Hinzman testified that Plaintiffs could afford to replace the insulation and would have done so

if it were their primary home but had not done so because the Property is a vacation home. *Id.* at 9-10.

On the subject of emotional damages, Mr. Hinzman testified that the cause of his emotional distress was that Mr. Kim allegedly told him that the attic of the Property was "sealed," which Mr. Hinzman viewed as "calling [him] a liar." Maloney Decl. Ex. 1, at 22-28. Mrs. Hinzman testified that the litigation of their dispute with Defendants "brings up . . . the stress of the fire itself," which she described as "pretty traumatic." Maloney Decl. Ex. 5, at 6-7. Mrs. Hinzman testified that she increased the dosage of one her anxiety medications. Gower Decl. Ex. 4, at 5-7.

### V. The Subsequent Complete Loss of the Property

In December 2025, trees fell on the Property during a storm. Little Decl. ¶ 4. ECF No. 81. This caused a complete loss of the Property. *Id.* ¶ 5. Defendant paid out the Policy limit for the December 2025 loss of the Property. *Id.* ¶¶ 6-7.

## DISCUSSION

Plaintiffs initially filed their case in Marion County Circuit Court and the case was subsequently removed to this Court following the filing of the First Amended Complaint. ECF No. 1-2. Plaintiffs bring claims for breach of contract, breach of the duty of good faith and fair dealing, and for negligence per se.

### I. Insurance Cases Generally

A federal court, sitting in diversity jurisdiction, applies state law to interpret an insurance policy. *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008). Under Oregon law, "[t]he overriding goal in construing

an insurance policy is to ascertain the intention of the parties." *Hunters Ridge Condo. Ass'n v. Sherwood Crossing, LLC*, 285 Or. App. 416, 422 (2017) (internal quotation marks and citation omitted). The court determines "the intention of the parties by analyzing the policy's express terms and conditions." *Id.* (citing *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992), and ORS 742.016(1) (providing that, with some exceptions, "every contract of insurance shall be construed according to the terms and conditions of the policy.")). The court interprets the terms of the policy from the perspective of an "ordinary purchaser of insurance." *Id.* (quoting *Congdon v. Berg*, 256 Or. App. 73, 87 (2013)) (quotation marks omitted). "The language used in a contract of insurance is entitled to a construction as favorable to the insured as in good conscience will be permitted, and every reasonable intendment will be allowed to support a view that will protect the insured and prevent forfeiture." *Schweigert v. Beneficial Standard Life Ins. Co.*, 204 Or. 294, 301 (1955) (citations omitted).

If an insurance policy explicitly defines a phrase, the court must apply that definition. *Holloway v. Republic Indem. Co. of America*, 341 Or. 642, 650 (2006). If the policy does not define the phrase in question, the court resorts "'to various aids of interpretation to discern the parties' intended meaning.'" *Id.* (quoting *Groshong v. Mutual Enumclaw Ins. Co.*, 329 Or. 303, 307-08 (1999)). "Under that interpretive framework, [the court] first consider[s] whether the phrase in question has a plain meaning, *i.e.*, whether it 'is susceptible to only one plausible interpretation.'" *Id.* (quoting *Groshong*, 329 Or. at 308). "If the phrase in question has a plain meaning, [the court] will apply the meaning and conduct no further analysis." *Id.* "If the phrase

in question has more than one plausible interpretation, [the court] will proceed to the second interpretive aid"—"[t]hat is, [the court] examine[s] the phrase in light of 'the particular context in which that phrase is used in the policy and the broader context of the policy as a whole.'" *Id.* (quoting *Hoffman Const.*, 313 Or. at 470) (alteration normalized).

"If the ambiguity remains after the court has engaged in those analytical exercises, then any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company and in favor of extending coverage to the insured." *North Pacific Ins. Co. v. Hamilton*, 332 Or. 20, 25 (2001) (internal quotation marks and citation omitted, alterations normalized). "[A] term is ambiguous . . . *only* if two or more plausible interpretations of that term withstand scrutiny, i.e., continue[ ] to be reasonable[.]" *Hoffman Const.*, 313 Or. at 470 (emphasis in original).

Generally, the insured bears the initial burden of proving coverage, the insurer has the burden of proving exclusions to coverage, and the insured has the burden of proving exceptions to exclusions. *Employers Ins. of Wausau, A Mut. Co. v. Tektronix, Inc.*, 211 Or. App. 485, 509, 514 (2007) (reasoning the party seeking the benefit of a particular provision generally bears the burden of proving its application).

## II. Proof of Loss

The Policy in this case provides that Defendant will "insure risk of direct, sudden and accidental physical loss to the property[.]" Maloney Decl. Ex. 7, at 5. The threshold challenge by Defendant is whether Plaintiffs have demonstrated that they have suffered a loss, which is a necessary condition to coverage under the Policy.

Here, Plaintiffs' claim for contract damages is based on the allegation that the attic and crawlspace insulation were damaged by the intrusion of wildfire smoke into the attic and crawlspace. *See* Gower Decl. Ex. 9 (itemizing $92,818.13 for replacing the attic and crawlspace insulation). There is no assertion that the interior carpeting or insulation within the walls is damaged.

As noted, the insured bears the initial burden of proving coverage under Oregon law. *Employers Ins. of Wausau*, 211, Or. App. At 509, 514; *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 222 Or. App. 453, 465 (2008). Defendant asserts that there is no evidence of damage to the insulation of the Property and so no evidence of a direct physical loss covered by the Policy.

In *Columbiaknit, Inc. v. Affiliated FM Insurance Co.*, No. Civ. 98-434-HU, 1999 WL 619100 (D. Or. 1999), the court confronted an issue that was instructively similar. In that case, the insured, a clothing company, had suffered water intrusion into its building. *Id.* at *1. The water saturated some of the garments stored in the building and, although efforts were made to salvage the clothing, a dispute developed over coverage for microbial and mold contamination of the textiles. *Id.* at *1-2.

Like the present case, *Columbiaknit* involved a policy that insured against direct physical loss or damage to covered property. *Columbiaknit*, 1999 WL 619100, at *4. The court found that the "physical" requirement required a "distinct, demonstrable, physical alteration of the property." *Id.* (internal quotation marks and citation omitted). "The recognition that physical damage or alteration of property may occur at the microscopic level does not obviate the requirement that physical

damage need be distinct and demonstrable," and this requirement "necessarily implicates the insured's burden of showing that a covered loss has occurred." *Id.* at *7. The court distinguished the facts of its case from methamphetamine odor damage cases, where "the physical damage is demonstrated by the persistent pervasive order," and noted that "in the absence of such odor, no physical damage could be found." *Id.* Of note, the court held that "[t]he mere adherence of molecules to porous surfaces, without more, does not equate physical loss or damage." *Id.*

In *Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064 (9th Cir. 2023), the Ninth Circuit similarly concluded that the Oregon Supreme Court would interpret "direct physical loss or damage" to "require physical alteration of property." *Id.* at 1066.[1]

Here, there is no dispute that smoke may have entered the attic and/or the crawlspace. The evidence is that SAC was found on a roof beam and in a pipe in the crawlspace. But the issue in Plaintiffs' claim is whether there was damage to the *insulation* in the attic and crawlspace of the Property. The only testing that was done on the insulation itself revealed no detectable levels of SAC.

As noted, the persistence of a pervasive odor might constitute a loss. *Oregon Clinic*, 75 F.4th at 1070 (citing *Farmers Insurance Co. of Oregon v. Trutanich*, 123 Or. App. 6 (1993)). However, in the present case, a succession of deponents testified that there was no detectable odor of smoke in the Property, including in the attic or

[1] The Ninth Circuit attempted to certify the question of the proper interpretation of "direct physical loss or damage" to the Oregon Supreme Court, but the request was denied. *Oregon Clinic v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1066 (9th Cir. 2023).

the crawlspace. Plaintiffs themselves testified smelling smoke, at least in certain areas of the Property (notably not the attic or crawlspace), but there is nothing connecting that odor to the insulation of the attic or the crawlspace.

In order to defeat summary judgment, the nonmoving party must "show more than the mere existence of a scintilla of evidence," or that "there is some 'metaphysical doubt' as to the material facts act issue." *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Here, there is no evidence of a distinct, demonstrable physical alteration of the insulation such that it was directly and physically damaged within the meaning of the Policy. The best Plaintiffs have been able to offer is a sheer possibility, or a "metaphysical doubt," that SAC particles might have contaminated the insulation with smoke reaching the attic and crawlspace. As noted, however, the actual testing of the insulation revealed no detectable levels of SAC. Consistent with *Columbiaknit* and *Oregon Clinic*, this showing is insufficient to carry their burden of showing a direct physical loss within the meaning of the Policy. Defendants are therefore entitled to summary judgment, and it is not necessary for the Court to reach the issues of actual cash value, replacement cost value, or the effect of the subsequent total loss of the Property in December 2025 on Plaintiffs' ability to recover for their claims in the present case.

## III. Negligence Per Se

To state a negligence claim under Oregon law, a plaintiff must prove "that defendant engaged in conduct that 'unreasonably created a foreseeable risk to a

protected interest of the kind of harm that befell the plaintiff.'" *Moody v. Oregon Community Credit Union*, 371 Or. 772, 783 (2023) (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987)). Generally, individuals do not have a legally protected interest in being free from emotional distress. *Id.* at 784. However, Oregon permits recovery for emotional distress damages in limited circumstances including, for example, "when the defendant 'negligently causes foreseeable, serious emotional distress and also infringes some other legally protected interest.'" *Id.* (quoting *Philibert v. Kluser*, 360 Or. 698, 702 (2016)). Once a common-law negligence claim has been established, the doctrine of "negligence per se" permits a plaintiff to create "presumption of negligence" by pointing to a violation of a statute or rule that defines the standard of care expected of a reasonably prudent person under the circumstances. *Id.* at 782 (quoting *Deckard v. Bunch*, 358 Or. 754, 761 n.6 (2016)). The burden then "shifts to the violator to prove that he or she acted reasonably under the circumstances." *Deckard*, 358 Or. at 761 n.6. The plaintiff must still establish the other elements of negligence. *Id.*

In *Moody*, the Oregon Supreme Court considered whether a life insurance beneficiary stated a cognizable negligence per se claim for emotional distress damages based on a first-party life insurer's alleged violation of ORS 764.230(1)(d) and (f) for failure to reasonably investigate and pay her claim for policy benefits. *Moody*, 371 Or. at 775-76. The Oregon Supreme Court concluded that "the insurance claim practices that ORS 746.230 requires and the emotional harm that foreseeably may occur if that statute is violated are sufficiently weighty to merit imposition of

liability for common-law negligence and recovery of emotional distress damages." *Id.* at 805. Although *Moody's* holding is limited, "several decisions in this District have extended *Moody's* holding to negligence per se claims based on alleged violations of ORS 764.230 outside the life insurance context." *Hayter v. Travelers Indemnity Co.*, 793 F. Supp.3d 1283, 1292 (D. Or. 2025) (collecting cases).

However, in *Moody* the Oregon Supreme Court cautioned that its "conclusion here does not make every contracting party liable for negligent conduct that causes purely psychological damage, nor does it make every statutory violation the basis for a common-law negligence claim for emotional distress damages." *Moody*, 371 Or. at 805-06. Oregon courts "will not permit recovery of purely emotional injury unless [they] determine that the claimed harm is of sufficient importance as a matter of public policy." *Id.* at 805 (internal quotation marks and citation omitted).

In this case, Plaintiffs assert that they suffered distress because Mr. Kim allegedly told them that the attic was sealed when it was not. Maloney Decl. Ex. 1, at 24-28. Mr. Hinzman testified that there was no other basis for the claim for emotional distress outside the documentation of the claim file. *Id.* at 28. Mrs. Hinzman testified that her emotional distress was caused by the litigation causing her to recall the traumatic experience of the fire itself and that she increased the dosage of her anxiety medication. Maloney Decl. Ex. 5, at 6-7; Gower Decl. Ex. 4, at 5-7. This falls short of the "objective indicators of possibly serious emotional injury" that *Moody* found essential. *Moody*¸ 371 Or. 803 (internal quotation marks and citation omitted).

Furthermore, as discussed in the previous sections, the attic of the Property *was* enclosed with no access point and the insulation of the crawlspace was enclosed in belly paper. Accessing either would have required destructive testing by cutting through the roof to reach the attic and cutting through the belly paper in the crawlspace. Plaintiffs' own experts declined to cut through the belly paper to reach the crawlspace insulation and, when they cut through the roof to reach the attic insulation, the subsequent testing revealed the Defendant's claim adjuster was correct—the insulation did not contain detectable levels of SAC.

No reasonable jury could rule in Plaintiffs' favor on their claim for negligence per se. Defendants are entitled to summary judgment on that claim.

**CONCLUSION**

For the reasons set forth above, the Court STRIKES pages 6 through 17 of Plaintiffs' Amended Response in Opposition to Defendant's Supplemental Briefing. ECF No. 85. Defendant's Motion for Summary Judgment, ECF No. 56, is GRANTED. Final judgment shall be entered accordingly.

It is so ORDERED and DATED this 8th day of September 2026.

/s/Ann Aiken
ANN AIKEN
United States District Judge